Filed 4/16/13  In re J.G. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.S.,<br><br>        Defendant and Appellant. | A136412<br><br>(Solano County<br>Super. Ct. No. J34634) |

In her third appeal in this dependency matter, the mother of eight-year-old J.G. (Mother) challenges the juvenile court's order terminating her parental rights to J.G.[1] She contends the order must be reversed because:  (1) the juvenile court erred in not appointing an expert in autism, a disorder from which J.G. suffered; (2) the beneficial parent-child-relationship exception to termination of parental rights applied; and (3) there was insufficient evidence to support a finding that J.G. was adoptable.  We reject the contentions and affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2011, we resolved Mother's two appeals and writ petition in nonpublished opinions (Apr. 29, 2011, A128565; May 4, 2011, A129655; Nov. 15, 2011, A133244).

---

[1]  Mother has another child, 14-year-old H.G., who is in a permanent planned living arrangement of long-term foster care and is not a party to this appeal.

To obtain context, maintain consistency and conserve judicial resources, we take judicial notice of our prior opinions. (Evid. Code, § 451, subd. (a); see *In re Luke L.* (1996) 44 Cal.App.4th 670, 674, fn. 3.) We restate from our prior opinions the essential facts underlying the prior proceedings as follows.

### *First appeal*

H.G. and J.G. are autistic, nonverbal children who require constant attention. The Solano County Health and Social Services Department (the Department) filed an original petition on behalf of then five-year-old H.G. on April 12, 2004, after Mother left him unsupervised for at least two hours while she slept. An original petition was filed on behalf of then five-month-old J.G. on February 10, 2005. The juvenile court dismissed both petitions after the Department developed a plan for services for Mother and a substance abuse assessment showed she had "no signs or symptoms of active addiction."

A second petition was filed on July 15, 2008, after J.G. was found wandering outside in only a diaper, the home was filthy with safety hazards everywhere, and Mother appeared to be under the influence of a controlled substance. The children were dirty and were eating dog food and other food off the floor. H.G. was "combative" with a police officer and J.G. tried to bite another officer. Mother was aggressive towards the social worker who responded to the home. She did not submit to random drug tests and did not participate in mental health and substance abuse evaluations. On one occasion, she pushed a security guard and the Department expressed concern with "the stability of [Mother's] emotional state as she [regularly] goes into rages which range from aggressive (mostly verbal), to yelling, irrational thoughts and then to crying within a matter of minutes." The juvenile court dismissed the second petition on May 5, 2009, after Mother agreed to participate in services.' "

The third petition was filed on January 22, 2010, after H.G. was found outside the home naked and J.G. was found walking up and down the street alone, naked and covered in feces. The home was filthy, the children had lice, and H.G. was diagnosed with scabies. Mother appeared to be under the influence of a controlled substance. On January 22, 2010, H.G. was placed in the same foster home in which he had been placed

2

during the second dependency action.  Mother appealed from the juvenile court's jurisdictional and dispositional orders and also challenged a restraining order that had been issued against her, asserting the restraining order was overbroad and created a conflict of interest, and that the Department had not complied with the Indian Child Welfare Act.  We affirmed the orders.

## *Second appeal*

On July 29, 2010, Mother filed a motion requesting that H.G. be placed in a different foster home or that a hearing be conducted "to determine whether removing [H.G.] from his placement would be in his best interest."  She declared she had "observed on several different occasions that [H.G. had] bruises of various size and coloration, and on varying places on his body, as well as other injuries."  Social worker Alexandra Fernandez declared that H.G. was a "very active child" who engaged in "self-injurious behaviors, including banging his head against the wall and hitting himself on the head with his hands."  At every visit Fernandez supervised, Mother inspected H.G.'s body by lifting his clothes and partially pulling his pants down.  She "also on occasion asserted that [H.G.] need[ed] to use the restroom, . . . [then] inspected his unclothed body as part of the trip to the restroom."  On at least one occasion when Fernandez attempted to redirect Mother and encourage her to spend her time visiting with her children, Mother challenged Fernandez, stating, "go ahead and report me."  A social worker had visited H.G.'s school and the foster home and had also made an unannounced visit to the foster home.  H.G. appeared to be well cared for and there was no evidence he was being abused.  The juvenile court denied Mother's request for an evidentiary hearing, stating it would not "serve any useful purpose in this case."  It also denied her motion to have H.G. placed in a different foster home.  Mother appealed from the juvenile court's orders, and we affirmed the orders.

## *Writ petition*

The Department filed a status review report on September 23, 2010, in which it reported that Mother was not in compliance with most of her case plan, was unemployed, and had moved at least twice during the review period.  She had not begun attending

3

individual psychotherapy. She believed she did not need parenting services or substance abuse intervention services and denied using drugs. She refused to be tested for drugs on five occasions and tested negative for drugs on one occasion. At the time of the report, Mother was having one 1-hour supervised visit with the children per week. She had attended most of her weekly visits and often greeted the children "with hugs, kisses, and snack foods." The juvenile court ordered continued reunification services to Mother and a minimum of two 1-hour visits per week.

On November 19, 2010, the Department reported that Mother was acting inappropriately during visits and that the "resulting chaos" made "visits stressful for the children." Despite an August 18, 2010 court order prohibiting her from disrobing H.G., Mother "continue[d] to obsess over bruising on [H.G.]," as she lifted his clothing, looked up and down his arm and on his back and shoulders searching for bruises. During one visit, Mother was " 'all over [H.G.],' " leaving J.G. "on his own." She told H.G. she was going to sue the county and that maybe the county could buy them a house. She called H.G. her "sexy boy" and discussed her dissatisfaction with H.G.'s foster care placement. The juvenile court reduced visits to once or twice per week, per the social worker's discretion.

On March 1, 2011, the Department reported that Mother's home had not yet been assessed and she had not begun individual counseling. Mother told the social worker that she "did not believe that the court should be involved with her and her children and that . . . she ha[d] filed an appeal in this matter." She stated there was "no reason . . . the children should not be with her" because she was "not neglectful of her children and in fact [wa]s over protective of them." The juvenile court continued reunification services to Mother and increased supervised visitation to two 1-hour visits per week.

On July 5, 2011, the Department recommended in its 18-month status review report that family reunification services for Mother be terminated and the matter be set for a section 366.26 hearing. Mother was living in a small "in-law type of housing unit" that was not adequate for housing the children. She reported to the social worker that she attended one individual counseling session and was told she did not need counseling.

4

She was not participating in substance abuse services and had refused to submit to a drug test on five occasions. A psychiatric evaluation showed that Mother's "insight into her personality traits and previous condition [wa]s not good." Mother was visiting the children twice a week, and some unsupervised visits had occurred.

At an August 22, 2011 contested 18-month review hearing, a social worker testified that Mother tested positive for methamphetamine that month. Mother had visited the children throughout the course of the case and many of the visits had gone well, but there were also reports of problems with Mother's behavior during visits. The parties agreed to accept an offer of proof that another social worker, if called to testify, would testify that she had been to Mother's residence twice, that she observed the children come "right to [Mother] as if they were comfortable," and that Mother "appeared engaged in taking care of the children."

Mother testified she had been in her current residence since February 2011 and was working as a care provider for a girl with severe autism. She planned to move into a larger home if the children were placed back in her care. She had been attending support groups, had read various books regarding autism, and was willing to continue working with the Department on family maintenance services if her children were placed back in her care. She wanted her children to come home with her immediately and denied there were issues preventing her from meeting their needs. She denied using drugs but had no explanation for the positive drug test.

The juvenile court ordered that the children remain in out-of-home placement, terminated reunification services to Mother, and scheduled a section 366.26 hearing. The court ordered a minimum of one supervised visit per week. Mother filed a notice of intent to file writ petition. We denied the writ petition.

### Current appeal

The Department filed a section 366.26 report on December 8, 2011, in which it recommended that the juvenile court select a permanent plan living arrangement for H.G. and continue the hearing for J.G. for six months to further assess J.G.'s permanent plan. Then seven-year-old J.G. was a client of North Bay Regional Center. He had been

diagnosed with autism and PICA (a pattern of eating nonfood items such as plastic and toys) and had developmental delays. He was not toilet trained, had auditory and sensory processing difficulties, threw tantrums, and tended to run back and forth across rooms. Although J.G. was nonverbal, he used a few sign language signs and gestures to communicate his needs, and also communicated through a communication system of pointing at pictures and icons. He enjoyed activities such as running and singing. He was attending a special school, and his individualized education plan (IEP) report noted he had improved "with his behavior and tantrums," was attending school regularly, and was "very healthy, and happy to learn." He was doing well in his foster family's home. His foster parents described him as a sweet child, and they loved him. They had expressed an interest in adopting him in the past but were, at the time of the report, interested in obtaining guardianship of him.

Mother was regularly attending weekly one-hour supervised visits with the children. She was affectionate with them, talked to them, brought them food and beverages, and told them she loved them. She was inappropriate at times and had poor boundaries. She continued to make allegations at almost every visit that H.G. was being abused. She also "touched [H.G.'s] genitals, and . . . call[ed] [him] her lover." She would tell the children that she had a new home and that they were coming home with her. She continued to bring "junk food and sodas for the children," even after being asked to bring healthy snacks and drinks. J.G. had diarrhea "after 99% of his visits" with Mother. The children made "a huge mess with food particles all over the room" and Mother did not clean up after them. If Mother was upset about something, she discussed them in front of the children, even after being asked not to do so. The Department believed Mother did not fully understand the children's special needs and was incapable of caring for them. She was unemployed and unable to provide a safe home for them.

The juvenile court held a contested section 366.26 hearing for H.G. on January 9, 2012. Social worker Franceen Rea testified regarding her concerns about Mother's behavior at visits with the children. Rea did not believe Mother was ready for unsupervised visits, as the children's disabilities left them vulnerable to abuse or neglect

6

and Mother had not adequately treated her substance abuse issues. Rea had seen Mother's apartment and testified it was "a nice place." She was concerned, however, that it was located on a busy street with a lot of traffic because of the children's tendency to wander away. Mother testified she wanted the children to be able to visit her at her home and that there was a dead bolt lock on her door to prevent the children from wandering away. She had educated herself about autism and planned on attending an educational seminar on autism. The juvenile court adopted the permanent plan of long-term foster care for H.G. without terminating Mother's parental rights to H.G. The court continued the section 366.26 hearing as to J.G.

In its May 23, 2012 section 366.26 report, the Department recommended terminating Mother's parental rights to J.G., with adoption as his permanent plan. The Department had conducted an adoptability review for J.G. and had determined he was adoptable due to his young age and good health, his ability to bond and attach to parental figures, and because his developmental and medical needs were being met and his foster parents were willing to adopt him. The foster parents had been married for 27 years and had a strong committed marriage and good communication skills. They were in good health, had eight grown children and a 14-year-old foster child with autism, and were conservators for a 28-year-old man with Down's Syndrome, who they had taken care of for 12 years. They lived in a six-bedroom, four-bath house, had a cabin in the woods, were financially stable, and had excellent parenting skills. They had no criminal history and no history of referrals for abuse or neglect. They loved J.G. "tremendously" and wanted him to "become a permanent member of their family."

Over the course of his life, J.G. had lived with his foster family for a total of three years and three months and had a trusting parent-child relationship with them. He was attached to his foster parents, and they were protective of him. When he first arrived at their house, he defecated and urinated all over the house, could not eat using utensils, and grunted to communicate his needs. The foster parents had worked with J.G. on appropriate toileting, eating, sign language, and social skills. They were meeting all of J.G.'s special needs and had demonstrated consistent, nurturing parenting skills. With

7

their patience and love, J.G. had "come a long way since he was placed with them." The foster parents were fully aware of what autism entails and had a structured home environment and good routines. They understand the legal and financial responsibilities of adoption. They had supervised Mother's visits with J.G. and had a positive relationship with her.

At an August 31, 2012 section 366.26 hearing for J.G., social worker Rea testified that while the prospective adoptive parents had previously expressed an interest in providing permanency for J.G. through a guardianship, they had decided they wanted to adopt him because they loved him, did not want him to be adopted by another family, did not want Mother to have decision-making capabilities, and did not want to have to return to court if Mother were to file petitions to undo the guardianship. Although the adoption home-study of the prospective adoptive parents was not yet completed, Rea saw no reason why the home study would not be approved. There were also no legal impediments to the successful adoption of J.G. by the prospective adoptive parents. Rea believed that if adoption with the prospective adoptive parents fell through, another adoptive family could be located because of J.G.'s age and good health, and because she had previously located adoptive placements for dependent children with autism.

Rea further testified that she had observed J.G.'s interactions with Mother during visits. Mother played with and talked to J.G., told him he was handsome and tickled him. Although J.G. responded to Mother's affection, he did not initiate physical contact with her or seek her out to meet his needs. H.G. and J.G. did not greet each other at the beginning of visits, usually played independently, and did not show any affection towards each other during visits. Rea had also observed J.G.'s interactions with the prospective adoptive parents. J.G. went up to the prospective adoptive parents frequently, communicated with them through the use of sign language, and requested food from them. He gave them hugs and kisses, cuddled with them, and appeared happy in their care. J.G. had made great progress since being placed with the prospective adoptive family. He used sign language instead of grunts and threw fewer tantrums. He was no longer insisting on sleeping on the floor and ate healthier meals. Rea opined that neither

8

the detriment of terminating parental rights nor the detriment of terminating J.G.'s sibling relationship with H.G. outweighed the benefits of adoption.

On cross-examination by Mother's counsel, Rea testified that while children with autism and developmental delays are more difficult to place, she had successfully placed children with the same level of autism as J.G. in adoptive homes. She had observed about 10 visits between Mother and J.G. that lasted one and a half to two hours each time. It was common for autistic children to not initiate contact with their parents or siblings because social interaction of autistic children is very different from that of other children. Rea reiterated that adoption was recommended for J.G. because guardianship was a less stable option, as Mother could petition the court to undo the guardianship. There was also a legal preference for adoption. She acknowledged there were occasional cases in which adoptive parents changed their minds and returned the children to the dependency system.

Mother testified that J.G. communicates with her using three sign language signs. She otherwise understood his intentions because she is his mother and knows him. She stated, for example, that she knew J.G. was happy when he got "real giggley." He was very happy at the beginning of visits and would run over and hug her. They also snuggled, made eye contact, and ran across the room for hugs. She understood when he was upset because he would throw tantrums, cry, and act disinterested. In response, Mother would hug him and bring him something to calm him down. She believed H.G. and J.G. were close but express their closeness in different ways due to their autism. They watch and touch each other in passing and also engage in mischief together. In contrast, they completely ignore other children who were strangers to them.

Mother further testified that she believed the prospective adoptive parents were taking good care of J.G. and had positive interactions with him. She preferred guardianship over adoption because she had been adopted and believed adoption isolates children from their biological families. She got along well with the prospective adoptive parents and believed they could all coparent J.G. and that she could play an active role in

his life.  She added that she had held J.G.'s educational rights and had been active in attending his individualized education and in making educational decisions for him.

The juvenile court found the sibling relationship exception to adoption did not apply in this case because there was insufficient evidence of a strong enough bond between H.G. and J.G.  The court further found that the beneficial parent-child relationship exception did not apply.  Although Mother visited J.G. regularly and they had a relationship that was "positive" and "one of affection," the court did not believe that severing that relationship would cause J.G. detriment sufficient to outweigh the benefits of adoption.  The court further found, by clear and convincing evidence, that J.G. was generally and specifically adoptable.  The court terminated Mother's parental rights to J.G. as well as the parental rights of all unknown fathers of J.G.

## DISCUSSION

### *Autism expert*

Mother contends the juvenile court erred in not appointing an autism expert because, without the benefit of such expert testimony, the court was incapable of adequately evaluating her relationship with J.G., who was autistic and formed attachments differently from children with typical development.  Mother forfeited the contention by failing to raise the issue below.  A reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been made but was not made in the trial court.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, overruled on another ground in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.)  While the appellate court has discretion to excuse forfeiture, our Supreme Court has said that "the appellate court's discretion should be exercised rarely and only in cases presenting important legal issues."  (*Ibid*.)  The discretion should be exercised with special care in dependency cases since they involve children and considerations such as permanency and stability are of paramount importance.  (*Ibid*.)

Mother acknowledges she did not object to the lack of expert testimony but asserts we should nevertheless address her contention because "[w]hether expert testimony is required before terminating parental rights for a severely autistic child is an important

10

issue of law. This is especially true since the incidence of autism has increased so dramatically in the last 50 years . . . ." We disagree. Although Mother has framed her contention in terms of the lack of an autism expert, what she is essentially arguing is that the juvenile court erred in not ordering and considering a bonding study regarding her relationship with J.G. It is settled that a juvenile court has no statutory obligation to order a bonding study before terminating parental rights (*In re Richard C*. (1998) 68 Cal.App.4th 1191, 1195) and that a parent forfeits the right to complain about the lack of a bonding study on appeal where he or she does not raise it below (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339). Thus, this is not one of those rare instances in which a reviewing court should exercise its discretion to excuse a party's failure to raise an issue below.

In any event, even assuming the issue was not forfeited, we would conclude the juvenile court did not abuse its discretion. (*In re Jennifer J*. (1992) 8 Cal.App.4th 1080, 1084 [juvenile court has discretion to appoint an expert to evaluate the child's bond to the parent].) In evaluating whether a juvenile court erred in not appointing an expert, "[t]he applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*In re Lorenzo C*., *supra*, 54 Cal.App.4th at p. 1341.) Expert witnesses are necessary only where "expert evidence is or may be required," and their testimony is limited to "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, §§ 730, 801, subd. (a).)

Here, the issue before the court was whether J.G. had a parental relationship to Mother that was so strong that he would suffer detriment that outweighed the benefits of adoption if parental rights were terminated. The record shows that J.G. demonstrated attachment behavior that was within the common experience of a lay person. J.G. had lived with his prospective adoptive parents for almost half of his life. He was attached to his foster parents; they met his day-to-day needs and were protective of him. He went up to the prospective adoptive parents frequently and used sign language to communicate his

needs to them.  He displayed affection for his prospective adoptive parents by hugging, kissing, and cuddling with them, and was the one who initiated those acts.  In contrast, Rea, who had observed approximately 10 visits between Mother and J.G., testified that she never saw J.G. seek out Mother's attention for his needs.  She did not observe him initiate affection towards her.  Because the strength and quality of J.G.'s relationship to Mother was an assessment that could be made within ordinary experience, no expert was necessary in deciding whether J.G.'s bond with Mother was so strong that the detriment that would result from severing that bond outweighed the benefits of adoption.

### *Beneficial parent-child relationship exception*

Mother contends the juvenile court erred in finding that the beneficial parent-child relationship exception to termination of parental rights did not apply.  We disagree.

The statutory exception urged by Mother provides that once a child is found to be adoptable, parental rights must be terminated unless the court finds that termination would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i), italics added.)  "Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  Thus, showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent is not sufficient where that relationship does not meet the child's need for a parent.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["for the exception to apply, the emotional attachment . . . must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].)  "[F]requent and loving contact" alone is not sufficient.  (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1420.)  A parent's failure to progress beyond monitored visitation with a child and to fulfill a "meaningful and significant parental role" justifies an order terminating parental rights.  (*In re Andrea R.* (1999) 75

12

Cal.App.4th 1093, 1109.)  It is the parent's burden to prove the exception.  (Evid. Code, § 500; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.)

Here, Mother had regular supervised visits with J.G.  She testified she had educated herself about autism, communicated with J.G. using three sign language signs, and understood him because she was his mother.  She exhibited affection towards him, played with him and tickled him, and told him she loved him.  The record shows, however, that Mother did not occupy a beneficial *parental* role in J.G.'s life.  She acted inappropriately during visits and had poor boundaries, including discussing issues relating to the dependency action in front of the children and telling them they could come home with her to her new home.  She continued to bring "junk food and sodas" after being asked to bring healthy snacks and drinks despite the fact that J.G. had stomach problems "after 99%" of the visits.  Instead of spending the visitation time bonding with her children, she inspected H.G. and made unfounded allegations of abuse at almost every visit and refused to acknowledge that H.G. was engaging in self-injurious behavior.  Moreover, there was evidence that J.G. did not initiate contact with Mother and did not seek her out to fulfill his needs in the way that he did with his prospective adoptive parents, who had taken care of him and had met all of his special needs for about half of his life.  At best, the evidence showed that Mother and J.G. shared an emotional bond, but that this was not enough to establish the beneficial parent-child relationship exception to termination of parental rights.

*In re S.B.* (2008) 164 Cal.App.4th 289 and *In re Scott B*. (2010) 188 Cal.App.4th 452, upon which Mother relies, are readily distinguishable.  In *In re S.B.*, the father " 'demonstrate[d] empathy and the ability to put himself in his daughter's place to recognize her needs' " and was in compliance with " 'every aspect' " of his case plan. (164 Cal.App.4th at pp. 294, 298.)  Although the child's grandmother, with whom the child lived, assumed the "more parental role," the father had been the child's primary caregiver for three years and they shared an "emotionally significant relationship" in which the child "derived comfort, affection, love, stimulation and guidance from her continued relationship with [her father]."  (*Id*. at pp. 295, 296, 300.)  In *In re Scott B.*, the

child, who was also autistic, had lived with his mother for nearly all of his life—nine out of 11 years. (188 Cal.App.4th at pp. 459, 471.) He was strongly bonded to his mother and drew stability from the consistency of their visits; it was "clear from the record" he would not be able to endure any interruption to the visits. (*Id.* at p. 471.) When he learned that he might be adopted by his foster family, his behavior regressed to growling and biting. (*Id.* at p. 458.) He was always clear in his desire to live with his mother and was adamant at the section 366.26 hearing that he did not want to be adopted. (*Id.* at p. 464.) Here, there was no evidence of a similarly strong bond between Mother and J.G. and there was nothing in the record indicating J.G. would suffer similar detriment if Mother's parental rights were terminated. The juvenile court properly determined that Mother had not met her burden of proving that the beneficial parent-child-relationship exception applied.

### *Adoptability*

Mother contends the evidence was insufficient to establish that J.G. was adoptable. We reject the contention.

"If the court determines, based on the assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) Determination of whether a child is likely to be adopted focuses first upon the characteristics of the child, e.g., whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt the child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) "[T]here must be convincing evidence of the likelihood that adoption will take place within a reasonable time." (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624.)

It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent "waiting in the wings." (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223, fn. 11.) However, the fact that a prospective adoptive parent has "expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade

individuals from adopting the child." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1312.) In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted by that family or some other family in a reasonable time. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.)

When the sufficiency of the evidence to support a finding is challenged on appeal, even where the standard of proof in the juvenile court is clear and convincing evidence, we must determine if there is any substantial evidence—that is, evidence that is reasonable, credible, and of solid value—to support the conclusion of the trier of fact. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924.) In making this determination, we resolve all conflicts in favor of the prevailing party. Issues of fact and credibility are questions for the trier of fact, and we do not reweigh the evidence when assessing its sufficiency. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.)

Here, substantial evidence supports the juvenile court's finding that J.G. is generally adoptable. J.G. was only seven years old at the time of the second contested section 366.26 hearing. He had various developmental delays but his condition had stabilized and his needs were being met by support services at North Bay Regional Center and the Office of Education. He had made significant progress while in his prospective adoptive parents' care. He had learned how to use sign language, gestures, and a communication system—rather than grunting or throwing tantrums—to communicate his needs. He was attending a special school regularly, was "very healthy, and happy to learn." He was not toilet trained but was using pull-up diapers, and was working on using utensils to eat. He had shown an ability to form parental attachments, as he initiated contact with his prospective adoptive parents, was affectionate towards them, communicated his needs to them through the use of sign language and other communication systems, and appeared happy in their care. J.G.'s prospective adoptive parents wanted to adopt him, and social worker Rea, who had 18 years of experience as a child welfare social worker and nine years of experience in the adoptions unit specifically, opined that if the prospective adoptive parents were not able to adopt J.G., she would be able to find other families who wished to adopt J.G. She acknowledged

15

that children with autism and developmental delays are more difficult to place, but testified that she had successfully placed children with the same level of autism as J.G. in adoptive homes.

Mother asserts it is questionable whether the prospective adoptive parents had made a "full commitment" to adopting J.G. because they wavered between legal guardianship and adoption in the past, and because their stated reasons for ultimately deciding to adopt J.G. did not adequately "explain why they changed their minds." Although, as noted, a prospective adoptive parent's "expressed interest" in adopting the child constitutes evidence the child is likely to be adopted (see *In re A.A.*, *supra*, 167 Cal.App.4th at pp. 1311-1312), there is no requirement that the prospective adoptive parents demonstrate a "full commitment" to adopting the child before the child can be found to be adoptable.[2]  Here, there is no question that the prospective adoptive parents, at the very least, had "expressed interest" in adopting J.G.  There was substantial evidence supporting the juvenile court's finding of adoptability.

**DISPOSITION**

The order terminating Mother's parental rights to J.G. is affirmed.

---

[2]  The law does not require a juvenile court to find a dependent child "generally adoptable" or "specifically adoptable" before terminating parental rights. (*In re A.A.*, *supra*, 167 Cal.App.4th at p. 1313.)  "All that is required is clear and convincing evidence of the likelihood that the dependent child will be adopted within a reasonable time." (§ 366.26, subd. (c)(1); *In re Zeth S.* (2003) 31 Cal.4th 396, 406.)

 

                                   _____

                                   McGuiness, P. J.

We concur:

_____

Pollak, J.

_____

Siggins, J.